## FORBEARANCE AGREEMENT

This Forbearance Agreement ("Agreement") is entered into as of the 1st day of June, 2020, and is made by and between: (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually a "Borrower" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); and (iv) the Lenders signatory thereto. For purposes of this Agreement, Administrative Agent, the Lenders, Borrowers and Guarantors are sometimes referred to herein collectively as "the Parties".

This Agreement is made with reference to the following facts:

A.   Borrowers made, executed and delivered to Administrative Agent that certain "Credit Agreement" dated as of February 26, 2018 (the "Original Agreement"), as amended and modified by that certain "First Amendment To Credit Agreement" dated as of February 1, 2019, and that certain "Second Amendment To Credit Agreement And Waiver" dated as of March 13, 2019 (collectively, the "Amendments" and, collectively with the Original Agreement, the "Credit Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Credit Agreement.

B.   In accordance with the Credit Agreement, Administrative Agent and the Lenders made extensions of credit and other Loans available to Borrowers in accordance with the Revolving Facility, the Term Loan A-1 Facility, the Term Loan A-2 Facility and the Term Loan A-3 Facility (collectively, the "Facilities").

C.   The Loans are further evidenced by the Revolving Note, the Term Loan A-1 Note, the Term Loan A-2 Note and the Term Loan A-3 Note (collectively and as amended, restated, supplemented and/or modified from time to time, the "Notes").

D.   In order to collateralize its obligations under the Credit Agreement and the Notes, Borrowers executed and delivered to Administrative Agent that certain "Security Agreement" dated as of February 26, 2018 (as amended, restated, supplemented and/or modified from time to time, the "Security Agreement"). Pursuant to the Security Agreement, Borrowers granted to Administrative Agent a security interest in all collateral described in the Security Agreement, including, among other things, all inventory, instruments, chattel paper, accounts, payment rights, licenses and general intangibles (each as defined in the Security Agreement), together with all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds) (collectively, the "Collateral"). Administrative Agent perfected its security interest in the Collateral by duly recording one or more UCC-1 Financing Statements with the Office of the Secretary of State of Utah (collectively, and as amended and/or continued from time to time, the "Financing Statements").

1

EXHIBIT 3

E.     In order to further collateralize its obligations under the Credit Agreement and the Notes, Meridian Restaurants Unlimited, LC, a Utah limited liability company ("Pledgor"), executed and delivered to Administrative Agent that certain "Pledge Agreement" dated as of February 26, 2018 (as amended, restated, supplemented and/or modified from time to time, the "Pledge Agreement"). Pursuant to the Pledge Agreement, Pledgor pledged to Administrative Agent a security interest in all capital stock, membership interests, partnership interests and all other "Pledged Collateral" (as defined in the Pledge Agreement). Administrative Agent perfected its security interest in the Pledged Collateral by duly recording the Financing Statements and by taking possession of certain of the Pledged Collateral.

F.     In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, Guarantors executed and delivered to Administrative Agent that certain "Continuing Guaranty" contained in Article X of the Credit Agreement (as amended, restated, supplemented and/or modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally and unconditionally guaranteed and promised to pay Administrative Agent, on demand, all obligations and indebtedness owed by Borrowers to Administrative Agent under the Credit Agreement, the Notes and the other Loan Documents.

G.     In addition to the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing Statements and the Guaranty, the Loans are also evidenced by other documents, instruments and agreements executed by Borrowers and/or Guarantors (collectively, "Loan Parties") in connection with the Loans and the Facilities (collectively, with the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing Statements, the Guaranty and this Agreement, the "Loan Documents").

H.     Administrative Agent has advanced funds to Borrowers pursuant to the Credit Agreement, the Notes and the other Loan Documents, and Administrative Agent has performed all other terms and conditions of the Notes and the other Loan Documents on its part to be performed.

I.     By letters dated July 26, 2019 and October 7, 2019 (collectively, the "Default Letters"), Administrative Agent provided formal notice to Loan Parties that multiple Events of Default (collectively, the "Existing Defaults") had occurred and were continuing under:

- Sections 2.03(b)(i) and 8.01(a) of the Credit Agreement due to Borrowers' failure to remit to Administrative Agent 100% of the Net Cash Proceeds (in the approximate amount of $7,010,000.00) received by Loan Parties from an Equity Issuance in July, 2019;

- Sections 6.04 and 8.01(c) of the Credit Agreement due to Borrowers' failure to timely pay past-due 2018 payroll and sales taxes to the proper Governmental Authorities;

- Sections 6.02(a) and 8.01(b) of the Credit Agreement due to Borrowers' failure to provide compliance Certificates for the Fiscal Quarter ended June 30, 2019 signed by a Responsible Officer;

- Sections 7.06 and 8.01(b) of the Credit Agreement due to Restricted Payments made by Borrowers to holders of Equity Interests during Borrowers' Fiscal

2

EXHIBIT 3

Quarters ending March 30, 2019 and June 30, 2019, when Defaults and Events of Default had occurred and were continuing;

- Sections 7.11(a) and 8.01(b) of the Credit Agreement due to Borrowers' failure to satisfy the Consolidated Pre-Compensation Fixed Charge Coverage Ratio for the Fiscal Quarter ending June 30, 2019;

- Sections 7.11(c) and 8.01(b) of the Credit Agreement due to Borrowers' failure to satisfy the minimum Current Ratio for the Fiscal Quarter ending June 30, 2019;

- Sections 7.11(d) and 8.01(b) of the Credit Agreement due to Borrowers' failure to satisfy the maximum Consolidated Lease Adjusted Leverage Ratio for the Fiscal Quarter ending June 30, 2019;

- Section 8.01(k) of the Credit Agreement due to the occurrence of a Change of Control as a result of the failure of David Harper to maintain day-to-day operational control of each Loan Party; and

- Section 8.01(d) of the Credit Agreement arising from inaccurate representations and warranties about whether the Existing Defaults were in existence and known to prior management of the Loan Parties at the time they executed the Amendments.

J.      In addition to the Existing Defaults, the Parties acknowledge and agree that the following new Events of Default (collectively, the "New Defaults") have occurred, or will occur under:

- Sections 7.11(a) and 8.01(b) of the Credit Agreement due to Borrowers' failure to satisfy the Consolidated Pre-Compensation Fixed Charge Coverage Ratio for the Fiscal Quarters ending December 31, 2019, and March 31, 2020;

- Sections 7.11(b) and 8.01(b) of the Credit Agreement due to Borrowers' failure to satisfy the Consolidated Post-Distribution Fixed Charge Coverage Ratio for the Fiscal Quarters ending December 31, 2019, and March 31, 2020;

- Sections 7.11(c) and 8.01(b) of the Credit Agreement due to Borrowers' failure to satisfy the minimum Current Ratio for the Fiscal Quarters ending December 31, 2019, and March 31, 2020;

- Sections 7.11(d) and 8.01(b) of the Credit Agreement due to Borrowers' failure to satisfy the maximum Consolidated Lease Adjusted Leverage Ratio for the Fiscal Quarters ending December 31, 2019, and March 31, 2020;

- Sections 2.03(b) and 8.01(a) of the Credit Agreement due to Borrowers' failure to deliver 100% of Net Cash Proceeds received by Borrowers from a $3,000,000 issuance or Disposition of Equity Interests by Borrowers' sponsor;

- Section 8(d) of the Credit Agreement arising from incorrect and misleading representations and warranties of Borrowers' financial performance to the

3

EXHIBIT 3

Administrative Agent and the Lenders during the time Borrowers made draws upon the Term Loan A-2 Facility; and

- Sections 2.05(a), 2.05(b), 2.05(d), 2.06(c), and 8.01(a) of the Credit Agreement due to Borrowers' failure to pay principal and interest on April 1, 2020 and May 1, 2020 on each of the Loans, which principal and interest payments will be deferred in accordance with Section VIII(A) of this Agreement.

K.      Loan Parties have requested that Administrative Agent formally and temporarily forbear from exercising its legal rights and remedies as to the Existing Defaults and the New Defaults (collectively, the "Ongoing Defaults"), and that Administrative Agent amend certain terms and conditions of the Credit Agreement.

L.      Administrative Agent is willing to formally and temporarily forbear from exercising its legal rights and remedies as to the Ongoing Defaults, and to amend certain terms and conditions of the Credit Agreement, only in accordance with this Agreement.

M.      IT IS THE INTENT OF THE PARTIES THAT THIS AGREEMENT ADDRESS THE DEBTS AND/OR OBLIGATIONS OF LOAN PARTIES TO ADMINISTRATIVE AGENT AND THE LENDERS WHICH ARE FULLY DESCRIBED HEREIN AND REFLECTED IN THE LOAN DOCUMENTS. THIS AGREEMENT DOES NOT PERTAIN TO THE OTHER FACILITIES OR ANY OTHER CREDIT FACILITIES, INDEBTEDNESS OR OBLIGATIONS OF BORROWERS TO ADMINISTRATIVE AGENT OR THE LENDERS NOT SPECIFICALLY ADDRESSED IN THIS AGREEMENT. ALL TERMS AND PROVISIONS OF THE CREDIT AGREEMENT, THE NOTES, THE SECURITY AGREEMENT, THE PLEDGE AGREEMENT, THE GUARANTY AND THE OTHER LOAN DOCUMENTS NOT SPECIFICALLY MODIFIED HEREIN SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH THEIR ORIGINAL TERMS.

**NOW, THEREFORE**, in consideration of: (i) the above recitals and the mutual promises contained in this Agreement; (ii) the execution of this Agreement; (iii) the satisfaction of all Conditions Precedent set forth in Section XI below; and (iii) for other and further valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

I.      Incorporation of Recitals.  Each of the foregoing Recitals is incorporated herein by this reference, and the Parties each agree that each of such Recitals is true and correct in all respects.

II.      Effective Date of Agreement.  This Agreement shall be deemed effective as of the date all of the Conditions Precedent set forth in Section XI below are satisfied (the "Effective Date").

III.      Acknowledgment of the Loan Documents and the Obligations.

A.      Execution of the Loan Documents.  Loan Parties each acknowledge and agree that Loan Parties have executed, among others, the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Guaranty and the other Loan Documents.

B.      Enforceability of the Loan Documents.  Loan Parties each expressly acknowledge and agree that: (i) Loan Parties each agreed to repay all amounts advanced by Administrative

4

EXHIBIT 3

Agent to Borrowers pursuant to the Loan Documents, together with interest thereon at the applicable rates set forth in the Loan Documents, together with all applicable fees and charges set forth in the Loan Documents; (ii) the Ongoing Defaults have occurred and as of the date hereof are continuing under the Loan Documents as set forth in the Recitals above; (iii) the Loan Documents have not been amended except as set forth herein; (iv) the Loan Documents constitute duly authorized, valid, binding and continuing agreements and obligations of Loan Parties to Administrative Agent, enforceable in accordance with their terms; and (v) as of the date hereof the Loan Parties have no claims, cross-claims, counterclaims, setoffs or defenses of any kind or nature which would in any way reduce or offset their respective joint and several obligations to Administrative Agent under the Loan Documents as of the date of execution of this Agreement.

C. The Collateral. Loan Parties each expressly acknowledge and agree that: (i) the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Financing Statements and other Loan Documents provide Administrative Agent with duly authorized, valid, binding, continuing and perfected security interests in the Collateral and the Pledged Shares; (ii) such perfected security interests in the Collateral and the Pledged Shares were granted to Administrative Agent for purposes of securing the Obligations and Loan Parties' continuing obligations to Administrative Agent under the Loan Documents; and (iii) as of the date hereof the Loan Parties have no claims, counterclaims, cross-claims, setoffs or defenses of any kind or nature which would in any way invalidate, result in the subordination of, delay the execution of, or otherwise negatively impact the security interests granted to Administrative Agent in the Collateral and the Pledged Shares as of the date of execution of this Agreement.

D. The Obligations. Loan Parties each expressly acknowledge and agree that by virtue of the Loan Documents, there is presently a balance on the Loans outstanding from Loan Parties to Administrative Agent, jointly and severally, in the following amounts as of May 1, 2020 (the "Obligations"):

- Revolving Loan Principal: $ 875,000.00.
- Revolving Loan Interest: $ 11,248.41.
- Term Loan A-1 Principal: $33,954,151.80.
- Term Loan A-1 Interest: $ 433,467.53.
- Term Loan A-2 Principal: $16,697,490.00.
- Term Loan A-2 Interest: $ 214,651.87.
- Term Loan A-3 Principal: $ 4,053,707.00.
- Term Loan A-3 Interest: $ 52,111.77.
- Financial Advisor Fees & Costs: $ 75,000.00.
- Attorneys' Fees & Costs: $ 85,275.90.

EXHIBIT 3

E.     Loan Parties each expressly acknowledge and agree that interest on the Loans continues to accrue on and after May 1, 2020 until paid; as well as all other fees, costs and additional charges due under the terms of this Agreement, the Credit Agreement, the Notes, the Guaranty and any of the other Loan Documents, including but not limited to all of Administrative Agent's reasonable outside counsel's attorneys' fees and costs.

IV.     Limited Scope of Agreement.  Nothing contained in this Agreement shall be interpreted as or be deemed a release or a waiver by Administrative Agent of any of the terms or conditions of the Credit Agreement, the Notes, the Guaranty or any of the other Loan Documents, except as specifically provided in this Agreement.  This Agreement does not constitute a waiver or release by Administrative Agent of any obligations between any of the Loan Parties and Lenders or Administrative Agent, nor a waiver by Administrative Agent of any defaults by Loan Parties under any of the Loan Documents, nor between Administrative Agent and any other person or entity.

V.     Administrative Agent's Agreement to Forbear During the Forbearance Period.  Subject to Loan Parties' satisfaction of all Conditions Precedent set forth in Section XI below, and so long as no New Event of Default (as defined below) occurs:

A.     Administrative Agent hereby agrees to forbear from exercising its rights and remedies, including the imposition of Default Interest, solely as to the Ongoing Defaults through the Maturity Date of the Revolving Facility and the Maturity Date of the Term Loan Facilities, as applicable (the "Forbearance Period").

B.     Loan Parties each acknowledge and agree that immediately after the Forbearance Period expires or immediately upon the occurrence of a New Event of Default (as defined below), Administrative Agent may, without any further notice other than as required by the Loan Documents, exercise all of the rights and remedies contained in the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement, this Agreement, any of the other Loan Documents and available under applicable law.

C.     Administrative Agent hereby agrees that the imposition of Default Interest with respect to any of the Ongoing Defaults prior to the Effective Date is hereby waived.

VI.     No Waiver.  The agreement of Administrative Agent under Section V of this Agreement to forbear as to the Ongoing Defaults shall not constitute a waiver of the Ongoing Defaults or any other Defaults or Events of Default that may exist under the Loan Documents.  Unless specifically modified herein, all terms and provisions of the Credit Agreement, the Notes and the other Loan Documents shall remain in full force and effect in accordance with their original terms.

VII.     Amendments to the Credit Agreement.  As additional consideration for Administrative Agent to enter into this Agreement, Administrative Agent and Loan Parties each agree that: (i) the following provisions of the Credit Agreement are hereby permanently modified; provided, however, that all terms and provisions of the Credit Agreement not specifically modified in this Agreement shall remain in full force and effect in accordance with their original terms; (ii) to the extent not already contained in the Credit Agreement, the following additional covenants are hereby added to the Credit Agreement; and (iii) all of the amendments, modifications and new covenants provided below shall survive the expiration of the Forbearance Period and shall remain in full force and effect until all of the Obligations are repaid in full, except as otherwise set forth below:

6

EXHIBIT 3

A.    Additional Definitions. The following additional definitions are hereby added to Section 1.01 of the Credit Agreement in their appropriate alphabetical order:

"*CARES Act*" has the meaning given for said term in Section 7.03(h) of this Agreement.

"*Deferred April Interest Payments*" has the meaning given for said term in Section VIII(A) below.

"*Deferred Interest*" has the meaning given for said term in the definition of "*Applicable Margin*".

"*Deferred Payments*" has the meaning given for said term in Section VIII(A) below.

"*Deferred Principal Payments*" has the meaning given for said term in Section VIII(A) below.

"*Forbearance Agreement*" means that certain "Forbearance Agreement" dated as of June 1, 2020, by and between Borrowers, Administrative Agent, the Lenders and the other Loan Parties signatory thereto, as amended, supplemented and/or modified from time to time.

"*Forbearance Period*" has the meaning given for said term in the Forbearance Agreement.

"*Increased Margin*" has the meaning provided for said term in the definition of "*Applicable Margin*".

"*PPP Loan*" has the meaning given for said term in Section 7.03(h) of this Agreement."

B.    Amendment to Maturity Date. The definition of "*Maturity Date*" contained in Section 1.01 of the Credit Agreement is hereby amended and restated in its entirety as follows;

"*Maturity Date*" means (a) with respect to the Revolving Facility, September 30, 2020, (b) with respect to each of the Term Loan Facilities, February 26, 2023; provided, however, that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day."

C.    Termination of Revolving Commitment. The Revolving Commitment is terminated as of the Effective Date, and all references in the Credit Agreement to the "Revolving Commitment" are hereby deleted. For the avoidance of doubt, Borrowers shall no longer be entitled to any Revolving Loans, and any Revolving Loans that are repaid may not be reborrowed.

D.    Increase in Interest Rate. The definition of "*Applicable Margin*" contained in Section 1.01 of the Credit Agreement is hereby amended by deleting the existing language immediately above the Pricing Level Table, and replacing it with the following new language:

"*Applicable Margin*" means, for any date, with respect to any Loan, the applicable rate per annum set forth in the table below opposite the Consolidated Lease

7

EXHIBIT 3

Adjusted Leverage Ratio, as determined as of the last day of the immediately preceding Fiscal Quarter; provided, however, that the applicable rates set forth in the table below shall be increased by the following amounts over the following time periods (the "Increased Margin"): (i) by an initial 100 bps from the Effective Date of the Forbearance Agreement through June 30, 2021; (ii) by an additional 100 bps on July 1, 2021; and (iii) by an additional 100 bps on July 1, 2022. The first cash-payment of interest based on the Increased Margin shall be due and payable on September 1, 2020. Additionally, Interest based on the Increased Margin shall be deferred for the five (5) monthly interest payments due on November 1st, December 1st, January 1st, February 1st and March 1st payment dates of each calendar year (the "Deferred Interest"). Said Deferred Interest for each such calendar month shall be due and payable six (6) months later with the applicable five (5) monthly interest payments due and payable on the following May 1st, June 1st, July 1st, August 1st and September 1st of each calendar year. All Deferred Interest must be completely repaid concurrently with a payoff of all other Obligations."

E.      Increase in Default Rate. The definition of "*Default Rate*" contained in Section 1.01 of the Credit Agreement is hereby amended by replacing the figure "2.0%" with the figure "3.0%".

F.      Amortization of Second Anniversary A-2s. Attached hereto as Exhibit "A" and incorporated herein by this reference is the amortization schedule with respect to the Second Anniversary Term Loan A-2s required by Section 2.05(b)(ii) of the Credit Agreement.

G.      Amendments Mandatory Prepayments. The following provisions of Section 2.03(b) of the Credit Agreement are hereby amended as follows:

- Section 2.03(b) of the Credit Agreement is hereby changed by adding the following new Sections 2.03(b)(v) and (vi), and re-numbering existing Sections 2.03(b)(v), (vi), (vii) and (viii) accordingly:

    "(v)    The Borrowers shall pay to Administrative Agent an amount equal to 100% of any Net Cash Proceeds existing at any time that the Borrowers' Consolidated Pre-Compensation Fixed Charge Coverage Ratio, measured as of the end of each Fiscal Quarter, is greater than 1.25 to 1.00.

    (vi)    The Borrowers shall pay to Administrative Agent an amount equal to 50% of any Distributions which the holders of Equity Interests elect to receive at any time that the Borrowers' Consolidated Post-Distribution Fixed Charge Coverage Ratio, measured as of the end of each Fiscal Quarter, is between 1.25 to 1.00 and 1.10 to 1.00."

- The introductory clause to Section 2.03(b)(vii) (as re-numbered from Section 2.03(b)(v) pursuant to this Agreement) is hereby amended and restated in its entirety as follows:

    "*Application*. All prepayments pursuant to the foregoing provisions of Section 2.03(b)(i) through (vi) shall be applied by the Administrative Agent, subject to

8

EXHIBIT 3

Section 2.12, in the following order (except as otherwise provided in Section 2.03(a)):"

H.     <u>Additional Financial Reporting.</u>  Immediately following Section 6.01(d) of the Credit Agreement, the following new 6.01(e) is added as follows:

"(e)     within the time limits set forth below, the following financial reports:

- Internal interim reportings, including store level reconciliations, due: (i) quarterly within 45 days of period close through and including the quarter ending December 31, 2020; and (ii) monthly within 30 days of period close commencing with the January 1, 2021 reporting period.
- Internal interim non-quarterly 2020 reportings, without store level reconciliations, due monthly within 30 days of period close.
- CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, to be delivered by no later than June 30, 2020.
- CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, to be delivered by no later than July 31, 2020.
- CPA prepared consolidated and combining audited financials for Fiscal Year ending 2020, to be delivered by no later than April 30, 2021.
- Updated initial projections for the following Fiscal Year required by 12/10/XX of each applicable year, and final projections before 2/28/XX of each applicable Fiscal Year."

I.     <u>Additional Reporting Regarding Taxes.</u>  Immediately following Section 6.02(d) of the Credit Agreement, the following new Sections 6.02(e), (f) and (g) are added as follows:

"(e)     concurrently with delivery of Borrowers' monthly financial statements and reporting, a written update on the status of accrual and payment of past-due federal and state income taxes.

(f)     by the close of business each Friday from the Effective Date until July 1, 2020: (i) a rolling 13-week cash flow report, in form acceptable to Administrative Agent in its sole and absolute discretion; and (ii) a weekly variance report showing Borrowers' actual to projected cash flow from the prior week (which cash flow report may be consolidated with the 13-week cash flow report).

(g)     promptly, copies of any and all correspondence, whether in letter or email form, from February, 2018, forward (until all Obligations are paid in full) that reference any breach or deviance from any of the Franchise Agreements including, but not limited to, all notices received in January 2020 regarding non-compliance under certain of the Franchise Agreements."

J.     <u>No Investments in Loan Parties.</u>  Section 7.02(f) of the Credit Agreement is hereby eliminated. For the avoidance of doubt, unless otherwise permitted in the Credit Agreement or this Agreement, Borrowers shall make no Investments in any Loan Parties.

.

US_144639379v3_209145-00068 5/29/2020 9:17 AM

EXHIBIT 3

.

K.   No Acquisitions.   Sections 6.12 and 7.02(g) of the Credit Agreement are hereby eliminated.  For the avoidance of doubt, Borrowers shall make no Acquisitions or Investments in new Restaurants.

L.   CAPEX Limitations.  The figure "$2,500,000" contained in Section 7.03(e) of the Credit Agreement is hereby changed to "$2,400,000 per year".

M.   Limited New Indebtedness Permitted.  Immediately following Section 7.03(g) of the Credit Agreement, the following new Section 7.03(h) is added as follows:

"(h)   Indebtedness in the form of loans authorized pursuant to and in compliance with the Coronavirus Aid, Relief, and Economic Security Act, as in effect on the date hereof ("CARES Act"), under the Paycheck Protection Program of the U.S. Small Business Administration (the "PPP Loan"), and/or other government or government aided relief programs. For avoidance of doubt, proceeds of any PPP Loan and/or other government or government aided relief programs shall not be considered Net Cash Proceeds or Indebtedness of the type specified in clause (a) of this definition."

N.   Amendment to Restricted Payments.  The following provisions of Section 7.06 of the Credit Agreement are hereby amended as follows:

- The title and very first clause of Section 7.06 of the Credit Agreement, immediately prior to the "(a)" are amended and restated as follows:

  "**Section 7.06 Restricted Payments**.  Subject to the final sentence of this Section 7.06, declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interest, except that (a) . . ."

- The following sentence is added immediately after the existing last sentence of Section 7.06 of the Credit Agreement:

  "Notwithstanding any other term or provision contained in this Section 7.06(a), no Restricted Payments or Distributions may be made, directly or indirectly, or any obligation to do so incurred (contingent or otherwise), or any Equity Interest Issued or sold, unless and until Administrative Agent shall have received Borrowers' Fiscal Year End 2020 reporting package and other Fiscal Year end financial statements."

O.   Amendment to "Consolidated Pre-Compensation Fixed Charge Coverage Ratio".  The following new language is hereby added immediately following the last sentence of Section 7.11(a) of the Credit Agreement, as follows:

"Commencing with the Fiscal Quarter ending on or about June 30, 2021, and for all Fiscal Quarters thereafter, to be less than 1.10 to 1.00; provided, however, that notwithstanding any other term of this Agreement, no Distributions are permitted unless and until: (i) Administrative Agent shall have received Borrowers' Fiscal Year End 2020 reporting package and other Fiscal Year End financial statements;

10

EXHIBIT 3

and (ii) any performance above 1.25 to 1.00 on the Consolidated Pre-Compensation Fixed Charge Coverage Ratio shall constitute a mandatory prepayment, which shall be immediately remitted to Administrative Agent for application to the Loans, in Administrative Agent's sole and absolute discretion."

P.    Amendment to "Consolidated Post-Distribution Fixed Charge Coverage Ratio". The following new language is added immediately following the last sentence of Section 7.11(b) of the Credit Agreement, as follows:

"provided, however, that notwithstanding any other term of this Agreement, commencing with the Fiscal Quarter ending on June 30 2021, no Distributions are permitted unless and until: (i) Administrative Agent shall have received Borrowers' Fiscal Year End 2020 reporting package and other Fiscal Year End financial statements; (ii) the Consolidated Pre-Compensation Fixed Charge Coverage Ratio is at least 1.25 to 1.00; (iii) Borrower is in compliance with any mandatory prepayment subject to Section 7.11(a) of this Agreement; and (iv) fifty percent (50%) of any Distributions that holders of Equity Interests elect to receive resulting from performance between 1.25 to 1.00 and 1.10 to 1.0 on the Consolidated Post-Distribution Fixed Charge Coverage Ratio, shall constitute a mandatory prepayment, which shall be immediately remitted to Administrative Agent for application to the Loans, in Administrative Agent's sole and absolute discretion."

Q.    Amendment to "Consolidated Lease Adjusted Leverage Ratio". The grid contained in Section 7.11(d) of the Credit Agreement is hereby amended and restated in its entirety as follows:

| Fiscal Periods Ending | Maximum Consolidated Lease Adjusted Leverage Ratio |
|---|---|
| Each Fiscal Quarter ending on or about March 31, 2018, through and including the Fiscal Quarter ending on or about December 31, 2018 | 6.00x |
| Each Fiscal Quarter ending on or about March 31, 2019, through and including the Fiscal Quarter ending on or about December 31, 2019 | 5.75x |
| Each Fiscal Quarter ending on or about March 31, 2020, through and including the Fiscal Quarter ending on or about June 30, 2021 | 6.50x |
| Each Fiscal Quarter ending on or about September 30, 2021, through and including the Fiscal Quarter ending on or about March 30, 2022 | 6.25x |

11

EXHIBIT 3

| Each Fiscal Quarter ending on or about June 30, 2022, and each Fiscal Quarter thereafter | 6.00x |
|---|---|

R.    Additional Financial Covenants.    Immediately following Section 7.11(d), the following new Section 7.11(e) and (f) are added as follows:

"(e)    **Minimum Consolidated EBITDA**. Permit Consolidated EBITDA to be less than:

- $3,360,000 for the Fiscal Quarter ending September 30, 2020.
- $5,015,000 for the trailing six (6) months ending December 31, 2020.
- $7,500,000 for the trailing nine (9) months ending March 31, 2021.

(f)    **Minimum Trailing Twelve Months Consolidated EBITDA**. Permit trailing twelve month Consolidated EBITDA to be less than:
- $10,325,000 for the Fiscal Quarter ending June 30, 2021.
- $11,235,000 for the Fiscal Quarter ending September 30, 2021.
- $11,380,000 for the Fiscal Year ending December 31, 2021, and the Fiscal Quarter ending March 31, 2022.
- $12,000,000 for the Fiscal Quarter ending June 30, 2022 and the Fiscal Quarter ending September 30, 2022.
- $12,480,000 for Fiscal Year ending December 31, 2022."

VIII.   Other Covenants and Agreements.  As additional consideration for all Parties to enter into this Agreement, the Parties each agree as follows:

A.    Deferral of Certain Principal and Interest Payments.   Upon the Effective Date:

- The monthly payments of principal on each of the Term Loans otherwise due on April 1, 2020; May 1, 2020; and June 1, 2020, as required by Sections 2.05(a), 2.05(b) and 2.05(d) of the Credit Agreement (collectively, the "Deferred Principal Payments"), are hereby deferred until the Maturity Date (unless otherwise accelerated to an earlier date due to the occurrence of an Event of Default other than the Ongoing Defaults, pursuant to Section 8.02(b) of the Credit Agreement).

- The monthly payments of interest on the Revolving Loan and each of the Term Loans otherwise due on April 1, 2020, as required by Sections 2.06(c) and (d) of the Credit Agreement (the "Deferred April Interest Payments"), are hereby deferred until October 1, 2020 (unless otherwise accelerated to an earlier date due to the occurrence of an Event of Default other than the Ongoing Defaults, pursuant to Section 8.02(b) of the Credit Agreement).

- For the avoidance of doubt, Loan Parties each acknowledge and agree that: (i) the Deferred April Interest Payments and the Deferred Principal Payments (collectively, the "Deferred Payments") shall accrue interest at

12

EXHIBIT 3

the applicable rates set forth in the Credit Agreement; (ii) Administrative Agent will apply all payments with respect to Deferred Payments, first, to accrued interest until all accrued interest has been paid. Thereafter, all such payments will be applied to principal and accrued interest in accordance with the terms of the Credit Agreement, which will result in a final payment that is greater than anticipated at the time of execution of the Credit Agreement; and (iii) Borrowers' repayment of the Deferred Payments shall be in addition to—not in lieu of—all regularly scheduled payments of principal and interest due under the Credit Agreement.

- Nothing contained in this Section VIII(A) shall restrict, prohibit or limit Administrative Agent's rights and remedies, including the acceleration of all Obligations (including all Deferred Payments) if a New Event of Default (as defined below) occurs and is not timely cured under this Forbearance Agreement.

B.     Reaffirmation of Representations and Warranties.   By signing below, with the exception of the Ongoing Defaults, Borrowers reaffirm the truth, accuracy and completeness of all representations and warranties contained in Article V of the Credit Agreement, as of the Effective Date.

C.     Reaffirmation of Covenants.   Borrowers shall continue to comply with all affirmative covenants, negative covenants, financial covenants, terms and provisions contained in the Credit Agreement, the Notes, this Agreement and the other Loan Documents, as modified hereby, after the Effective Date.

D.     Creation and Use of Collection Accounts. Borrowers covenant and agree to upgrade their treasury management/cash management systems within 180 days of the Effective Date such that each and every store-level depository account is automatically (i.e. not a manual process) aggregated at least once per week into consolidation accounts at Borrowers' three (3) major banks (collectively, the "Consolidation Accounts"). Borrowers shall provide Administrative Agent with a list of all depository account numbers for the Consolidation Accounts prior to the Effective Date, and Borrowers shall provide Administrative Agent with monthly electronic copies of all bank statements for each of the Consolidation Accounts within ten (10) days of statement dates.

E.     DACA's Governing the Consolidation Accounts.   Within sixty (60) days after the Effective Date, Borrowers covenant and agree to obtain Deposit Account Control Agreements ("DACAS") duly executed by Borrowers, Administrative Agent and each depository institution where the Consolidation Accounts are located. The DACAS must provide Administrative Agent with a duly perfected, first-priority security interest in each of the Consolidation Accounts.

F.     Retention of Advisor.   By no later than February 28, 2020, Borrowers shall: (i) retain a third-party financial advisor/consultant mutually acceptable to Borrowers and Administrative Agent, each in their reasonable discretion (an "Advisor"); and (ii) provide Administrative Agent with the engagement/retention agreement by and between Borrowers and Advisor. Borrowers and Administrative Agent each agree that: (i) Thomas Kim of R-2 Advisors is a mutually acceptable Advisor; and (ii) Advisor's retention shall continue throughout the entirety of the Forbearance Period; and (iii) that a New Event of Default will occur if Advisor is terminated

13

EXHIBIT 3

without Administrative Agent's prior written consent, or if the Scope of Services (as defined below) is modified without Administrative Agent's prior written consent.

       1.    Scope of Services.  The scope of the Advisor's services must also be mutually acceptable to Borrowers and Administrative Agent, each in their reasonable discretion (collectively, the "Scope of Services"), but shall include: (i) reviewing, vetting and evaluating the accuracy of Borrowers' monthly and quarterly financial reportings; (ii) advising regarding Borrowers' preparations of projected income statement, cash flows, financial covenant levels and MD&A reportings; (iii) assisting in the Borrowers' evaluation of the existing business model and assisting in the Borrowers' development of alternative models based on evaluation of key assumptions regarding revenue levels and operating margin; and (iv) assisting in the Borrowers' evaluation and development of restructuring strategies for addressing Borrowers' indebtedness to Administrative Agent, Franchisor, taxing authorities and other creditors.

       2.    Dialogue and Disclosure to Administrative Agent.  Borrowers hereby consent to Advisor engaging in verbal dialogue with Administrative Agent (only within the presence of Borrowers, unless Borrowers' consent otherwise in advance) regarding all aspects of Advisor's services to Borrowers; provided, however, that Borrowers covenant and agree to make themselves available for said dialogues with Advisor upon reasonable notice from Administrative Agent.

      G.    Verification of Franchisor Support.  It shall be a condition precedent to the effectiveness of this Agreement that Borrowers provide evidence reasonably satisfactory to Administrative Agent that Franchisor has been made aware of the principal terms of this Agreement and indicated its support of the transactions contemplated herein.

      H.    No Payment of Subordinated Debt.  Borrowers covenant and agree not to make any payments of principal, interest, fees or other amounts in connection with funded debt owed by any of Borrowers to any of Loan Parties ("Subordinated Debt") until all Obligations have been paid in full.

      I.    Continuing Cooperation with Administrative Agent.  Borrowers hereby covenant and agree to cooperate with all reasonable requests of Administrative Agent and its representatives for information, personnel and cooperation from Borrowers in connection with all field examinations, appraisals and audits commenced by Administrative Agent during the Forbearance Period.  Borrowers shall promptly reimburse Administrative Agent and its representatives for all fees and costs incurred for said field examinations, appraisals and audits as Ongoing Expenses (as defined in Section X below).

      J.    No Amendment to Swap Contract or Swap Obligations.  Nothing contained in this Agreement is intended to amend, alter, modify or otherwise impact any Swap Contracts or Swap Obligations.  Any breakage, fees, costs and Swap Termination Value shall remain the financial responsibility of each of the Loan Parties.

IX.    Forbearance Fee.  As consideration for entering into this Agreement, Borrowers shall pay to Administrative Agent, for the benefit of the Lenders, a one-time Forbearance Fee in the amount of $1,250,000.00 (the "Forbearance Fee").  The Forbearance Fee shall be fully earned as of the

EXHIBIT 3

Effective Date, and shall be payable in the following installments: (i) $50,000 to be paid on or before August 31, 2020; (ii) $50,000 to be paid on or before September 30, 2020; (iii) $200,000 to be paid on or before July 1, 2021; and (iv) $950,000 to be paid on or before July 1, 2022; provided, however, that $350,000 of the Forbearance Fee shall be waived by Administrative Agent if all indebtedness and other Obligations owed to Administrative Agent and the Lenders are paid in full by July 1, 2021, and that $100,000 of the Forbearance Fee shall be waived by Administrative Agent if all indebtedness and other Obligations owed to Administrative Agent and Lenders are paid in full between July 1, 2021, and July 1, 2022.

X.      Administrative Agent's Fees and Costs.  Borrowers shall reimburse Administrative Agent for all of Administrative Agent's invoiced costs and expenses, including reasonable attorneys' fees of Administrative Agent's outside counsel (Katten) and Administrative Agent's financial advisor (Sierra Constellation) incurred prior to the Effective Date in connection with the preparation, due diligence, negotiation, documentation and implementation of this Agreement (collectively, the "Transaction Costs") by no later than September 1, 2020.  In addition to the Transaction Costs, Borrowers shall also reimburse Administrative Agent for its ongoing audit fees, financial advisory fees, monitoring costs and other costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses of Administrative Agent's outside counsel) incurred after the Effective Date hereof in connection with the ongoing negotiation, documentation, implementation, monitoring and enforcement of the Credit Agreement, the Notes, this Agreement and the other Loan Documents (collectively, the "Ongoing Expenses") within thirty (30) calendar days after receipt by Borrowers of an invoice from Administrative Agent or its agents.  All Transaction Costs and Ongoing Expenses may be auto-debited from Borrowers' accounts at Administrative Agent.

XI.     Conditions Precedent.  This Agreement shall not be binding upon Administrative Agent unless and until each of the following conditions precedent (each a "Condition Precedent") is met by no later than the close of business on June 1, 2020, or is waived in writing by Administrative Agent, at which time this Agreement shall become effective as of the Effective Date:

        A.      Execution and Delivery of this Agreement.  Administrative Agent shall have received this Agreement, duly executed by an authorized officer of Borrowers;

        B.      Consent of Guarantors.  Guarantors shall each have executed and delivered to Administrative Agent the "Consent and Reaffirmation of Guarantors" attached to the end of this Agreement (the "Guarantors Consent");

        C.      Release of Claims.  Loan Parties shall have executed this Agreement and the Guarantors Consent, thereby indicating their consent to the Release of Claims ("Release") set forth below in Section XIV below, with such signatures indicating that Loan Parties have each read and accepted the terms of such Release;

        D.      Account Numbers for the Consolidation Accounts.  Borrowers shall have provided Administrative Agent with a list of all depository account numbers for the Consolidation Accounts; and

        E.      Verification of Franchisor Support.  Administrative Agent shall have received satisfactory verification of the Franchisor support required by Section VIII(G) above.

15

EXHIBIT 3

F.      Other Approvals.  Administrative Agent shall have received such other documents, instruments and agreements, and obtained all necessary internal approvals as Administrative Agent may require.

XII.    New Events of Default.  A "New Event of Default" shall occur under this Agreement if any Default or Event of Default, other than the Ongoing Defaults, shall occur in the performance of any term, condition, covenant or agreement contained in this Agreement, the Credit Agreement or in any of the other Loan Documents; provided, however, that any applicable notice and cure periods in the Credit Agreement, the Notes and the other Loan Documents will remain unchanged.

XIII.   Remedies.  If a New Event of Default occurs, Administrative Agent may exercise, at its election, and without notice, demand, protest or presentment (which notice, demand, protest and presentment are expressly waived), in addition to all rights and remedies granted to it in this Agreement, the Credit Agreement, any of the other Loan Documents any or all of the following:

A.      Administrative Agent's limited agreement to forbear under this Agreement shall immediately and automatically cease, and Administrative Agent may exercise all of its rights and remedies available under this Agreement, the Credit Agreement, any of the other Loan Documents and applicable law; and/or

B.      Administrative Agent may declare all of the Obligations to be immediately due and payable in full; and/or

C.      Administrative Agent may impose the Default Rate of interest on all Obligations;

D.      Administrative Agent may enforce any of its rights and remedies as to the Collateral and the Pledged Shares; and/or

E.      Administrative Agent may proceed to enforce this Agreement, the Credit Agreement and any of the other Loan Documents and exercise any or all of the rights and remedies afforded to Administrative Agent by the California Commercial Code, the California Civil Code, the California Code of Civil Procedure or otherwise possessed by Administrative Agent.

F.      Cumulative Rights and Remedies.  All rights and remedies granted to Administrative Agent hereunder are cumulative, and Administrative Agent shall have the right to exercise any one or more of such rights and remedies alternatively, successively or concurrently, subject to applicable law, as Administrative Agent may, in its sole and absolute discretion, deem advisable.

XIV.    Release of Claims.  Loan Parties each represent and agree that each has diligently and thoroughly investigated the existence of any Claim (as defined below), and, to its knowledge and belief, no Claim exists and no facts exist that could give rise to or support a Claim.  As additional consideration for Administrative Agent to enter into this Agreement, Loan Parties, and each of them, by their execution of this Agreement or the Guarantors Consent, and each of Loan Parties' respective agents, employees, directors, officers, attorneys, affiliates, subsidiaries, shareholders, trusts, owners, successors and assigns (each a "Releasing Party" and collectively, the "Releasing Parties"), hereby releases and forever discharges Administrative Agent and each of the Lenders, and each of their respective agents, direct and indirect shareholders, employees, directors, officers, attorneys, branches, affiliates, subsidiaries, predecessors, successors and assigns (each a "Released

16

EXHIBIT 3

Party" and collectively, the "Released Parties"), from all damages, losses, claims, demands, liabilities, obligations, actions and causes of action whatsoever from the beginning of time through and including the Effective Date (collectively, the "Claims") that the Releasing Parties or any of them may, as of the date hereof, have or claim to have against any or all of the Released Parties, in each case whether currently known or unknown or with respect to which the facts are known (or should have been known), that could give rise to or support a Claim and of every nature and extent whatsoever on account of or in any way relating to, arising out of or based upon: (a) the Loans; (b) the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Guaranty and the other Loan Documents, and the obligations evidenced thereby, including, without implied limitation, the terms thereof; (c) any alleged oral or written agreements or understandings by and between any of Releasing Parties and any of Released Parties in any way arising out of or related to the Loans, any of the Loan Documents, the Collateral, the Obligations, or any amendments, modifications, representations or warranties in relation thereto; (d) the disbursement, administration and monitoring of the Loans and the Loan Documents; (e) actions of Administrative Agent with respect to Franchisor; (f) the Ongoing Defaults; and (g) the business relationships between Borrowers and Administrative Agent, and between Borrowers and the Lenders from the beginning of time through and including the Effective Date (collectively, the "Claims").

Loan Parties each further covenant and agree that each has not heretofore assigned, and will not hereafter sue any Released Party upon, any Claim released or purported to be released under this Section XIV, and Loan Parties each agree to indemnify and hold harmless the Released Parties against any loss or liability on account of any actions brought by any of Loan Parties or their respective assigns or prosecuted on behalf of said Loan Party relating to any Claim released or purported to be released under this Section XIV. It is further understood and agreed that any and all rights under the provisions of Section 1542 of the California Civil Code, and other similar rights or laws in other states, are expressly waived by each of Loan Parties. Section 1542 of the California Civil Code provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

XV.   Revival Clause.  If the incurring of any debt or the payment of money or transfer of property made to Administrative Agent by or on behalf of any Loan Party should for any reason subsequently be declared to be "fraudulent" or "preferential" within the meaning of any state or federal law relating to creditor's rights, including, without limitation, fraudulent conveyances, preferences or otherwise voidable or recoverable payments of money or transfers of property, in whole or in part, for any reason (collectively, "Voidable Transfers") under the Bankruptcy Code or any other federal or state law, and Administrative Agent is required to repay or restore any such Voidable Transfer or the amount or any portion thereof, or upon the advice of its in-house counsel or outside counsel is advised to do so, then, as to such Voidable Transfer or the amount repaid or restored (including all reasonable costs, expenses and attorneys' fees of Administrative Agent related thereto), the joint and several liability of Loan Parties under this Agreement, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents, and all of Administrative Agent's rights and remedies under this Agreement,

17

EXHIBIT 3

the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents shall automatically be revived, reinstated and restored and shall exist as though such Voidable Transfer had never been made to the extent of any harm to Administrative Agent.

Loan Parties each represent and warrant that the execution, delivery and performance of this Agreement will not: (i) render any of Loan Parties insolvent as that term is defined below; (ii) leave any of Loan Parties with remaining assets which constitute unreasonably small capital given the nature of said Loan Parties' business; or (iii) result in the incurrence of Debts (as defined below) beyond any of Loan Parties' ability to pay them when and as they mature and become due and payable. For the purposes of this paragraph, "Insolvent" means that the present fair salable value of assets is less than the amount that will be required to pay the probable liability on existing Debts as they become absolute and matured. For the purposes of this paragraph, "Debts" includes any legal liability for indebtedness, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent. Loan Parties each hereby acknowledge and warrant that they have derived or expects to derive a financial or other benefit or advantage from this Agreement.

XVI.    Payment of Expenses.   In the event any action (whether or not in a court proceeding) shall be required to interpret, implement, modify, or enforce the terms and provisions of this Agreement and/or to declare rights under same, the prevailing party in such action shall recover from the losing party all of its reasonable fees and costs, including, but not limited to, the reasonable attorneys' fees and costs of Administrative Agent's outside counsel.

XVII.   Governing Law.   This Agreement shall be construed and interpreted in accordance with and shall be governed by the laws of the State of California.

XVIII.  Successors, Assignment.   This Agreement shall be binding on and inure to the benefit of all of the Parties, and upon the heirs, executors, administrators, legal representatives, successors and assigns of the Parties, and each of them. The terms and provisions of this Agreement are for the exclusive benefit of Loan Parties and Administrative Agent, and may not be transferred, assigned, pledged, set over or negotiated to any person or entity without the prior express written consent of Administrative Agent and in accordance with the Credit Agreement.

XIX.    Complete Agreement of Parties.   This Agreement constitutes the entire agreement between Administrative Agent and Loan Parties arising out of, related to or connected with the subject matter of this Agreement. Any supplements, modifications, waivers or terminations of this Agreement shall not be binding unless executed in writing by the parties to be bound thereby. No waiver of any provision of this Agreement shall constitute a waiver of any other provision of this Agreement (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided.

XX.     Authority.   Loan Parties each represent and warrant that: (i) each has full authority to execute this Agreement; (ii) the execution, delivery and performance of this Agreement does not require the consent or approval of any person, entity, governmental body, trust, trustor or other authority; (iii) this Agreement is a valid, binding and legal obligation of all Loan Parties enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity, and does not contravene or conflict with any other agreement, indenture or undertaking to which any Loan Party is a party, except the Credit

18

EXHIBIT 3

Agreement, the Notes or any of the other Loan Documents; and (iv) Loan Parties are the sole and lawful owners of all right, title, and interest in and to every claim and other matter which Loan Parties purport to settle or compromise herein.

XXI.   Execution In Counterparts.   This Agreement may be executed in any number of counterparts each of which, when so executed and delivered, shall be deemed an original, and all of which together shall constitute but one and the same Agreement.

XXII.   Contradictory Terms/Severability.   In the event that any term or provision of this Agreement contradicts any term or provision of any other document, instrument or agreement between the Parties including, but not limited to, the Credit Agreement, the Notes or any of the other Loan Documents, the terms of this Agreement shall control.   If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired, and shall thereby remain in full force and effect.

XXIII.   Headings.   All headings contained herein are for convenience purposes only, and shall not be considered when interpreting this Agreement.

XXIV.   Continuing Cooperation.   The Parties shall cooperate with each other in carrying out the terms and intent of this Agreement, and shall execute such other documents, instruments and Agreements as are reasonably required to effectuate the terms and intent of this Agreement.

XXV.   Consultation With Counsel.   Each party hereto acknowledges that it is freely and voluntarily entering into this Agreement.   Moreover, each party hereto also acknowledges that it has been represented by counsel of its own choice at each stage in the negotiation of this Agreement, or has knowingly and voluntarily elected not to be represented by counsel at each stage in the negotiation of this Agreement.   To the extent any party was represented by counsel, and without waiving the attorney-client and attorney work product privileges, said party acknowledges that: (i) it has relied on such counsel's advice throughout all of the negotiations which preceded the execution of this Agreement, and in connection with the preparation and execution of this Agreement; (ii) such counsel has read and approved this Agreement; and (iii) such counsel has advised such party concerning the validity and effectiveness of this Agreement, and the transactions to be consummated in accordance therewith.

19

EXHIBIT 3

AGREED AND ACCEPTED:

ADMINISTRATIVE AGENT:    CITY NATIONAL BANK

By: *Raymond Forgette*
Name: ___ Raymond Forgette
Its: ___ Vice President_____

LENDER:    CITY NATIONAL BANK

By: *Raymond Forgette*
Name: ___ Raymond Forgette
Its: ___ Vice President

LENDER:    BRIDGE FUNDING GROUP, INC.

By: _____
Name: _____
Title:_____

BORROWER:    NKS RESTAURANTS, L.C.

By: _____
Name: _____
Title:_____

BORROWER:    HR RESTAURANTS, L.C.

By: _____
Name: _____
Title:_____

*[signatures continued on next page]*

BORROWER:    AZM RESTAURANTS UNLIMITED, L.C.

By: _____
Name: _____
Title:_____

I

XXVI.  Notices.  All notices, payments, requests, information and demands which any party hereto may desire, or may be required to give or make to the other party shall be given or made to such party in accordance with the existing provisions of the Notes and the other Loan Documents.

**AGREED AND ACCEPTED:**

**ADMINISTRATIVE AGENT:**          CITY NATIONAL BANK

By: _____
Name: _____
Its: _____

**LENDER:**          CITY NATIONAL BANK

By: _____
Name: _____
Its: _____

**LENDER:**          BRIDGE FUNDING GROUP, INC.

By: Mary Stuart Kilmer
Name: Mary Stuart Kilmer
Title: Managing Senior Credit Officer

**BORROWER:**          NKS RESTAURANTS, L.C.

By: _____
Name: GARRETT CARTER
Title: CFO

**BORROWER:**          HR RESTAURANTS, L.C.

By: _____
Name: GARRETT CARTER
Title: CFO

*[signatures continued on next page]*

20

EXHIBIT 3

BORROWER:                      MR RESTAURANTS, L.C.

                               By: _____
                               Name: _GARRETT CAZIER_
                               Title: _CFO_

BORROWER:                      C UTAH, L.C.

                               By: _____
                               Name: _GARRETT CAZIER_
                               Title: _CFO_

BORROWER:                      AZM RESTAURANTS UNLIMITED, L.C.

                               By: _____
                               Name: _GARRETT CAZIER_
                               Title: _CFO_

BORROWER:                      NDM RESTAURANTS, L.C.

                               By: _____
                               Name: _GARRETT CAZIER_
                               Title: _CFO_

EXHIBIT 3

## SCHEDULE A—
## AMORTIZATION SCHEDULE FOR SECOND ANNIVERSARY TERM LOAN A-2S

22

EXHIBIT 3

MR Restaurants - Modified 120m amort - $1,450,304.47 @ 5.00%

| Payment Date | Principal Payment Amount | Principal Balance |
|---|---|---|
| 3/1/2020 | | 1,450,304.47 |
| 4/1/2020 | 9,526.88 | 1,440,777.59 |
| 5/1/2020 | 9,526.88 | 1,431,250.72 |
| 6/1/2020 | 9,526.88 | 1,421,723.84 |
| 7/1/2020 | 9,526.88 | 1,412,196.97 |
| 8/1/2020 | 9,526.88 | 1,402,670.09 |
| 9/1/2020 | 9,526.88 | 1,393,143.21 |
| 10/1/2020 | 9,526.88 | 1,383,616.34 |
| 11/1/2020 | 9,526.88 | 1,374,089.46 |
| 12/1/2020 | 9,526.88 | 1,364,562.58 |
| 1/1/2021 | 9,526.88 | 1,355,035.71 |
| 2/1/2021 | 9,526.88 | 1,345,508.83 |
| 3/1/2021 | 9,526.88 | 1,335,981.96 |
| 4/1/2021 | 10,021.22 | 1,325,960.74 |
| 5/1/2021 | 10,021.22 | 1,315,939.52 |
| 6/1/2021 | 10,021.22 | 1,305,918.31 |
| 7/1/2021 | 10,021.22 | 1,295,897.09 |
| 8/1/2021 | 10,021.22 | 1,285,875.87 |
| 9/1/2021 | 10,021.22 | 1,275,854.66 |
| 10/1/2021 | 10,021.22 | 1,265,833.44 |
| 11/1/2021 | 10,021.22 | 1,255,812.23 |
| 12/1/2021 | 10,021.22 | 1,245,791.01 |
| 1/1/2022 | 10,021.22 | 1,235,769.79 |
| 2/1/2022 | 10,021.22 | 1,225,748.58 |
| 3/1/2022 | 10,021.22 | 1,215,727.36 |
| 4/1/2022 | 10,485.20 | 1,205,242.16 |
| 5/1/2022 | 10,485.20 | 1,194,756.97 |
| 6/1/2022 | 10,485.20 | 1,184,271.77 |
| 7/1/2022 | 10,485.20 | 1,173,786.57 |
| 8/1/2022 | 10,485.20 | 1,163,301.38 |
| 9/1/2022 | 10,485.20 | 1,152,816.18 |
| 10/1/2022 | 10,485.20 | 1,142,330.98 |
| 11/1/2022 | 10,485.20 | 1,131,845.78 |
| 12/1/2022 | 10,485.20 | 1,121,360.59 |
| 1/1/2023 | 10,485.20 | 1,110,875.39 |
| 2/1/2023 | 10,485.20 | 1,100,390.19 |
| 2/26/2023 | 1,100,390.19 | 0.00 |

EXHIBIT 3

## CONSENT AND REAFFIRMATION OF GUARANTORS

This Consent And Reaffirmation of Guarantors (this "Consent") is made with reference to that certain "Forbearance Agreement" dated as of June 1, 2020, by and between (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually, a "Borrowers" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); and (iv) the Lenders signatory thereto (the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Agreement.

In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"), executed and delivered to Administrative Agent that certain "Continuing Guaranty" set forth in Article X of the Credit Agreement (as amended and modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally and unconditionally guaranteed and promised to pay Administrative Agent, on demand, all Obligations and indebtedness owed by Borrowers to Administrative Agent under the Credit Agreement, the Notes and the other Loan Documents.

EXHIBIT 3

By executing below, Guarantors each hereby: (i) acknowledges and consents to Borrowers' execution of the Agreement; (ii) consents to all terms and conditions of the transactions contemplated in the Agreement; (iii) ratifies and affirms all of the terms, covenants, conditions and obligations contained in the Guaranty; (iv) reaffirms the continuing validity and enforceability of the Guaranty; (v) confirms that the Guaranty continues in full force and effect notwithstanding the execution of the Agreement; and (vi) knowingly and voluntarily agrees to join in and be bound to the terms of the Release of Claims contained in Section XIV of the Agreement.

AGREED AND ACCEPTED AS OF THIS 1ST DAY OF JUNE, 2020

GUARANTOR:

MERIDIAN RESTAURANTS UNLIMITED, LC

By: _____
Name: Garrett Cazier
Title: CFO

GUARANTOR:

LOVELOUD RESTAURANTS, L.C.

By: _____
Name: Garrett Cazier
Title: CFO

24

EXHIBIT 3

## AMENDMENT TO FORBEARANCE AGREEMENT

This Amendment To Forbearance Agreement (this "Amendment") is entered into as of August 17, 2020, and is made by and between: (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually a "Borrower" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (individually a "Guarantor" and, collectively, "Guarantors"); and (iv) the Lenders signatory thereto. For purposes of this Amendment, Administrative Agent, the Lenders, Borrowers and Guarantors are sometimes referred to herein collectively as "the Parties". This Amendment is made with reference to the following facts:

A.     Borrower and Lender are parties to that certain "Forbearance Agreement" dated as of June 1, 2020 (as otherwise amended, supplemented and modified from time to time, the "Forbearance Agreement"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Forbearance Agreement.

B.     In accordance with the Forbearance Agreement, Administrative Agent agreed to forbear as to the Ongoing Defaults, but not as to any New Events of Default that arose after the Effective Date of the Forbearance Agreement.

C.     By letter dated August 12, 2020, Administrative Agent notified Loan Parties that the following New Events of Default have occurred and are continuing under Section XII of the Forbearance Agreement and Section 8.01(b) of the Credit Agreement (collectively, the "New Defaults"):

- A New Event of Default due to Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, by no later than June 30, 2020, in violation of Section 6.01(e) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, by no later than July 31, 2020, in violation of Section 6.01(e) of the Credit Agreement;
- A New Event of Default due to Borrowers' failure to deliver any of the following reports to Agent: (i) a rolling 13-week cash flow report, in form acceptable to Administrative Agent in its sole and absolute discretion; and (ii) a weekly variance report showing Borrowers' actual to projected cash flow from the prior week (which cash flow report may be consolidated with the 13-week cash flow report) from the close of business each Friday from the Effective Date of the Forbearance Agreement (June 9, 2020), until July 1, 2020, in violation of Section 6.02(f) of the Credit Agreement; and
- A New Event of Default due to Borrowers' failure to deliver executed DACAS within sixty (60) days after the Effective Date of the Forbearance Agreement (June 9. 2020), in violation of Section VIII(D) of the Forbearance Agreement.

1

EXHIBIT 3

D.     As a result of the occurrence and continuation of the New Defaults--and in accordance with Section 2.06(b)(iii) of the Credit Agreement and Section XIII(C) of the Forbearance Agreement--Agent and Required Lenders exercised their right to impose the Default Rate on all outstanding Obligations, effective as of August 12, 2020.

E.     In addition to the New Defaults, by letter dated July 7, 2020, Loan Parties were notified that a potential New Event of Default had occurred under Section XII of the Forbearance Agreement and Section 8.01(m) of the Credit Agreement (the "Franchise Default") because on June 16, 2020, Franchisor formally declared multiple defaults by Guarantor Loveloud Restaurants, L.C. ("Loveloud") under a "Development Agreement", which constitutes a "Franchise Agreement" (each as defined in the Credit Agreement).   In accordance with Section 8.01(m) of the Credit Agreement, the Franchise Default does not, at this time, constitute a New Event of Default because Borrowers and Franchisor are both working diligently to cure the Franchise Default, as demonstrated to Agent in Agent's sole and absolute discretion.

F.     Loan Parties have requested that Administrative Agent continue to forbear from exercising its legal rights and remedies as to the Ongoing Defaults, as well as the New Defaults. Loan Parties have also requested that Administrative Agent and the Lenders amend certain terms and provisions of the Credit Agreement and the Forbearance Agreement, as set forth more fully below.

G.     Administrative Agent is willing to continue to forbear from exercising its legal rights and remedies as to the Ongoing Defaults and the New Defaults, only in accordance with this Amendment.  Administrative Agent is also willing to amend certain terms and provisions of the Credit Agreement and the Forbearance Agreement, only in accordance with this Amendment.

H.     IT IS THE INTENT OF THE PARTIES THAT THIS AMENDMENT ADDRESS THE DEBTS AND/OR OBLIGATIONS OF LOAN PARTIES TO ADMINISTRATIVE AGENT AND THE LENDERS WHICH ARE FULLY DESCRIBED HEREIN AND REFLECTED IN THE LOAN DOCUMENTS.  THIS AMENDMENT DOES NOT PERTAIN TO THE OTHER FACILITIES OR ANY OTHER CREDIT FACILITIES, INDEBTEDNESS OR OBLIGATIONS OF LOAN PARTIES TO ADMINISTRATIVE AGENT OR THE LENDERS NOT SPECIFICALLY ADDRESSED IN THIS AMENDMENT.  ALL TERMS AND PROVISIONS OF THE CREDIT AGREEMENT, THE NOTES, THE SECURITY AGREEMENT, THE PLEDGE AGREEMENT, THE GUARANTY AND THE OTHER LOAN DOCUMENTS NOT SPECIFICALLY MODIFIED HEREIN SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH THEIR ORIGINAL TERMS.

**NOW, THEREFORE**, in consideration of: (i) the above recitals and the mutual promises contained in this Amendment; (ii) the execution of this Amendment; (iii) the satisfaction of all Conditions Precedent set forth in Section X below; and (iv) for other and further valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

I.     Incorporation of Recitals.  Each of the foregoing Recitals is incorporated herein by this reference, and the Parties each agree that each of such Recitals is true and correct in all respects.

2

EXHIBIT 3

II.     Effective Date of Agreement.  This Amendment shall be deemed effective as of the date all of the Conditions Precedent set forth in Section X below are satisfied (the "Effective Date").

III.    Limited Scope of Amendment.  Nothing contained in this Amendment shall be interpreted as or be deemed a release or a waiver by Administrative Agent of any of the terms or conditions of the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty or any other Loan Documents, except as specifically provided in this Amendment.  Unless specifically modified herein, all other terms and provisions of the Forbearance Agreement, the Credit Agreement, the Notes, the Guaranty and the other Loan Documents shall remain in full force and effect in accordance with their original terms.

IV.     Reaffirmation of Recitals and Acknowledgements in the Forbearance Agreement.  All Recitals and Acknowledgements set forth in Sections I and III of the Forbearance Agreement are hereby validated and affirmed through the Effective Date of this Amendment.

V.      Revocation of Default Rate.  Subject to satisfaction of all Conditions Precedent set forth in Section X below, Administrative Agent hereby agrees to revoke the imposition of the Default Rate, effective as of August 12, 2020 (the day it was imposed).

VI.     Amendments to the Credit Agreement.  As additional consideration for Administrative Agent to enter into this Amendment, Administrative Agent and Loan Parties each agree that: (i) the following provisions of the Credit Agreement are hereby permanently modified; provided, however, that all terms and provisions of the Credit Agreement not specifically modified in this Amendment shall remain in full force and effect in accordance with their original terms; (ii) to the extent not already contained in the Credit Agreement, the following additional covenants are hereby added to the Credit Agreement, as set forth below; and (iii) all of the amendments, modifications and new covenants provided below shall survive the expiration of the Forbearance Period and shall remain in full force and effect until all of the Obligations are repaid in full, except as otherwise set forth below:

        A.      Change to Financial Reporting Requirements.  Section 6.01(e) of the Credit Agreement is hereby amended and restated as follows:

        "(e)    within the time limits set forth below, the following financial reports:

        • Internal interim reportings, including store level reconciliations, due: (i) quarterly within 45 days of period close, commencing with the quarter ending June 30, 2020 and continuing through the reporting period ending December 31, 2020; and (ii) monthly within 30 days of period close, commencing with the reporting period ending January 31, 2021 and continuing throughout the remainder of the Forbearance Period (collectively, the "Monthly Reports").
        • Internal interim non-quarterly 2020 reportings, without store level reconciliations, due monthly within 30 days of period close, commencing with the July 31, 2020 reporting period and continuing thereafter until the Monthly Reports (as defined immediately above) commence on January 31, 2021; provided, however, that said reports will not be due for the months ending June 30, September 30, December 31, and March 31.

3

EXHIBIT 3

- CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, to be delivered by no later than September 30, 2020.
- CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, to be delivered by no later than September 30, 2020.
- CPA prepared consolidated and combining audited financials for Fiscal Year ending 2020, to be delivered by no later than April 30, 2021.
- Updated initial projections for the following Fiscal Year required by 12/10/XX of each applicable year, and final projections before 2/28/XX of each applicable Fiscal Year."

B.    Amendment to 13-Week Cash Flow Reporting. Sections 6.02(f) of the Credit Agreement is hereby amended and restated in its entirety as follows:

"(f)    within one week after the close of each calendar month, commencing on the Effective Date and continuing until the end of the Forbearance Period: (i) a rolling 13-week cash flow report, in form acceptable to Administrative Agent in its sole and absolute discretion; and (ii) a monthly variance report showing Borrowers' actual to projected cash flow from the prior month (which cash flow report may be consolidated with the 13-week cash flow report)."

C.    Additional Reporting Regarding Franchisor. Section 6.02(g) of the Credit Agreement is hereby amended and restated in its entirety as follows:

"(g)    (i) promptly, copies of any and all correspondence, whether in letter or email form, from February, 2018, forward (until all Obligations are paid in full) that reference any breach or deviance from any of the Franchise Agreements including, but not limited to, all notices received in January 2020, and June 2020, regarding non-compliance under certain of the Franchise Agreements; and (ii) concurrently with the delivery of the 13-week cash flow reporting required by Section 6.02(f) herein, a written report describing Borrowers' negotiations, discussions, settlements and agreements with Franchisor in connection with the Franchise Default."

D.    Amendment to Definition of "Events of Default". So long as Borrowers timely and adequately cure the Franchise Default in accordance with Section 8.01(m) of the Credit Agreement to Administrative Agent's satisfaction (which "cure" may include termination of the "Loveloud Agreement", as defined immediately below), the Parties agree to add the following new proviso immediately after the last sentence of Section 8.01(m) of the Credit Agreement:

"provided; however, that that certain "Area Development and Remodeling Agreement" dated December 30, 2017, by and among Franchisor, Loveloud and Harper (the "Loveloud Agreement") shall not be considered a "Franchise Agreement" for purposes of this Section 8.01(m), and any default or event of default by the Loan Parties with respect to such Area Development Agreement arising after the Effective Date shall not constitute an Event of Default or potential Event of Default."

4

EXHIBIT 3

E.    Amendment to "Consolidated Lease Adjusted Leverage Ratio". Section 7.11(d) of the Credit Agreement is hereby amended and restated in its entirety, effective as of the Effective Date of the Forbearance Agreement, as follows:

"(d)    **_Consolidated Lease Adjusted Leverage Ratio_**. Permit the Consolidated Lease Adjusted Leverage Ratio, measured as of the periods referenced below, commencing with the Fiscal Quarter ending on or about March 31, 2018, to exceed the following:

| **Fiscal Periods Ending** | **Maximum Consolidated Lease Adjusted Leverage Ratio** |
|---|---|
| Each Fiscal Quarter ending on or about March 31, 2018, through and including the Fiscal Quarter ending on or about December 31, 2018 | 6.00x |
| Each Fiscal Quarter ending on or about March 31, 2019, through and including the Fiscal Quarter ending on or about December 31, 2019 | 5.75x |
| For the trailing twelve months period ending on or about June 30, 2021 | 6.50x |
| For the trailing twelve months periods ending on or about September 30, 2021, December 31, 2021, and March 30, 2022 | 6.25x |
| For the trailing twelve months period ending on or about June 30, 2022, and each trailing twelve months period ending on each Fiscal Quarter thereafter | 6.00x |

VII.    Amendments to the Forbearance Agreement. As additional consideration for Administrative Agent to enter into this Amendment, Administrative Agent and Loan Parties each agree that: (i) the following provisions of the Forbearance Agreement are hereby permanently modified; provided, however, that all terms and provisions of the Forbearance Agreement not specifically modified in this Amendment shall remain in full force and effect in accordance with their original terms; (ii) to the extent not already contained in the Forbearance Agreement, the following additional covenants are hereby added to the Forbearance Agreement, as set forth below; and (iii) all of the amendments, modifications and new covenants provided below shall survive the

5

EXHIBIT 3

expiration of the Forbearance Period and shall remain in full force and effect until all of the Obligations are repaid in full, except as otherwise set forth below:

A.      Amendment to Definition of "Ongoing Defaults". Recital "K" of the Forbearance Agreement is hereby amended and restated in its entirety as follows:

"K.      Loan Parties have requested that Administrative Agent formally and temporarily forbear from exercising its legal rights and remedies as to the Existing Defaults, the New Defaults and each of the Events of Default described immediately below (collectively with the Existing Defaults and the New Defaults, the "Ongoing Defaults"), and that Administrative Agent amend certain terms and conditions of the Credit Agreement:

- Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials of the short Fiscal Year ending 2018, by no later than June 30, 2020, in violation of Section 6.01(e) of the Credit Agreement;

- Borrowers' failure to deliver their CPA prepared consolidated and combining audited financials for Fiscal Year ending 2019, by no later than July 31, 2020, in violation of Section 6.01(e) of the Credit Agreement;

- Borrowers' failure to deliver any of the following reports to Administrative Agent: (a) a rolling 13-week cash flow report, in form acceptable to Agent in its sole and absolute discretion; and (b) Borrowers' failure to deliver to Agent a weekly variance report showing Borrowers' actual to projected cash flow from the prior week (which cash flow report may be consolidated with the 13-week cash flow report), from the close of business each Friday from June 9, 2020, until July 1, 2020, in violation of Section 6.02(f) of the Credit Agreement; and

- Borrowers' failure to deliver executed DACAS within sixty (60) days after the Effective Date of the Forbearance Agreement (which Effective Date was June 9, 2020), in violation of Section VIII(D) of the Forbearance Agreement."

B.      Amendment to Definition of "Consolidation Accounts". Section VIII(D) of the Forbearance Agreement is hereby amended by deleting the words "*Borrowers' three (3) major banks*", and replacing them with the words "*Borrowers' two (2) major banks, Wells Fargo Bank and Zions Bank*".

C.      Amendment to Timing of DACAS. The first sentence of Section VIII(E) of the Forbearance Agreement is hereby amended by deleting the words "*Within sixty (60) days after the Effective Date*", and replacing them with the words "*By no later than October 1, 2020*".

VIII.   Amendment Fee. As consideration for entering into this Amendment, Borrowers shall pay to Administrative Agent, for the benefit of the Lenders, a one-time Amendment Fee in the amount of $15,000 (the "Amendment Fee"). The Amendment Fee shall be fully earned as of the Effective Date, and shall be payable as a Condition Precedent to the effectiveness of this Amendment. For

6

EXHIBIT 3

the avoidance of doubt, the Amendment Fee is separate and distinct from the Forbearance Fee which is due and payable in accordance with Section IX of the Forbearance Agreement.

IX.      Administrative Agent's Fees and Costs. Borrowers shall reimburse Administrative Agent for all of Administrative Agent's invoiced costs and expenses, including reasonable attorneys' fees of Administrative Agent's outside counsel (Katten) incurred prior to the Effective Date in connection with the preparation, due diligence, negotiation, documentation and implementation of this Amendment (collectively, the "Transaction Costs") by no later than September 1, 2020. In addition to the Transaction Costs, Borrowers shall also reimburse Administrative Agent for its ongoing audit fees, financial advisory fees, monitoring costs and other costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses of Administrative Agent's outside counsel) incurred after the Effective Date hereof in connection with the ongoing negotiation, documentation, implementation, monitoring and enforcement of the Credit Agreement, the Notes, this Amendment and the other Loan Documents (collectively, the "Ongoing Expenses") within thirty (30) calendar days after receipt by Borrowers of an invoice from Administrative Agent or its agents. The Amendment Fee and all Transaction Costs and Ongoing Expenses may be auto-debited from Borrowers' accounts at Administrative Agent.

X.      Conditions Precedent. This Amendment shall not be binding upon Administrative Agent unless and until each of the following conditions precedent (each a "Condition Precedent") is met by no later than the close of business on September 11, 2020, or is waived in writing by Administrative Agent, at which time this Amendment shall become effective as of the Effective Date:

        A.      Execution and Delivery of this Amendment. Administrative Agent shall have received this Amendment, duly executed by an authorized officer of Borrowers;

        B.      Consent of Guarantors. Guarantors shall each have executed and delivered to Administrative Agent the "Consent and Reaffirmation of Guarantors" attached to the end of this Amendment (the "Guarantors Consent");

        C.      Amendment Fee. Borrowers shall have paid the Amendment Fee to Administrative Agent; and

        D.      Release of Claims. Loan Parties shall have executed this Amendment and the Guarantors Consent, thereby indicating their consent to the Release of Claims ("Release") set forth below in Section XI below, with such signatures indicating that Loan Parties have each read and accepted the terms of such Release;

        E.      Other Approvals. Administrative Agent shall have received such other documents, instruments and agreements, and obtained all necessary internal approvals as Administrative Agent may require.

XI. Release of Claims. Loan Parties each represent and agree that each has diligently and thoroughly investigated the existence of any Claim (as defined below), and, to its knowledge and belief, no Claim exists and no facts exist that could give rise to or support a Claim. As additional consideration for Administrative Agent to enter into this Amendment, Loan Parties, and each of them, by their execution of this Amendment or the Guarantors Consent, and each of Loan Parties' respective agents, employees, directors, officers, attorneys, affiliates, subsidiaries, shareholders,

7

EXHIBIT 3

trusts, owners, successors and assigns (each a "Releasing Party" and collectively, the "Releasing Parties"), hereby releases and forever discharges Administrative Agent and each of the Lenders, and each of their respective agents, direct and indirect shareholders, employees, directors, officers, attorneys, branches, affiliates, subsidiaries, predecessors, successors and assigns (each a "Released Party" and collectively, the "Released Parties"), from all damages, losses, claims, demands, liabilities, obligations, actions and causes of action whatsoever from the beginning of time through and including the Effective Date (collectively, the "Claims") that the Releasing Parties or any of them may, as of the date hereof, have or claim to have against any or all of the Released Parties, in each case whether currently known or unknown or with respect to which the facts are known (or should have been known), that could give rise to or support a Claim and of every nature and extent whatsoever on account of or in any way relating to, arising out of or based upon: (a) the Loans; (b) the Forbearance Agreement, the Credit Agreement, the Notes, the Security Agreement, the Pledge Agreement, the Guaranty and the other Loan Documents, and the obligations evidenced thereby, including, without implied limitation, the terms thereof; (c) any alleged oral or written agreements or understandings by and between any of Releasing Parties and any of Released Parties in any way arising out of or related to the Loans, the Forbearance Agreement, any of the Loan Documents, the Collateral, the Obligations, or any amendments, modifications, representations or warranties in relation thereto; (d) the disbursement, administration and monitoring of the Loans and the Loan Documents; (e) actions of Administrative Agent with respect to Franchisor; (f) the Ongoing Defaults, the New Defaults or the Franchise Default; and (g) the business relationships between Borrowers and Administrative Agent, and between Borrowers and the Lenders from the beginning of time through and including the Effective Date (collectively, the "Claims").

Loan Parties each further covenant and agree that each has not heretofore assigned, and will not hereafter sue any Released Party upon, any Claim released or purported to be released under this Section XI, and Loan Parties each agree to indemnify and hold harmless the Released Parties against any loss or liability on account of any actions brought by any of Loan Parties or their respective assigns or prosecuted on behalf of said Loan Party relating to any Claim released or purported to be released under this Section XI. It is further understood and agreed that any and all rights under the provisions of Section 1542 of the California Civil Code, and other similar rights or laws in other states, are expressly waived by each of Loan Parties. Section 1542 of the California Civil Code provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

XII.     Revival Clause. If the incurring of any debt or the payment of money or transfer of property made to Administrative Agent by or on behalf of any Loan Party should for any reason subsequently be declared to be "fraudulent" or "preferential" within the meaning of any state or federal law relating to creditor's rights, including, without limitation, fraudulent conveyances, preferences or otherwise voidable or recoverable payments of money or transfers of property, in whole or in part, for any reason (collectively, "Voidable Transfers") under the Bankruptcy Code or any other federal or state law, and Administrative Agent is required to repay or restore any such Voidable Transfer or the amount or any portion thereof, or upon the advice of its in-house counsel or outside counsel is advised to do so, then, as to such Voidable Transfer or the amount repaid or

8

EXHIBIT 3

restored (including all reasonable costs, expenses and attorneys' fees of Administrative Agent related thereto), the joint and several liability of Loan Parties under this Amendment, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents, and all of Administrative Agent's rights and remedies under this Amendment, the Credit Agreement, the Notes, the Guaranty, the Security Agreement, the Pledge Agreement and the other Loan Documents shall automatically be revived, reinstated and restored and shall exist as though such Voidable Transfer had never been made to the extent of any harm to Administrative Agent.

Loan Parties each represent and warrant that the execution, delivery and performance of this Amendment will not: (i) render any of Loan Parties insolvent as that term is defined below; (ii) leave any of Loan Parties with remaining assets which constitute unreasonably small capital given the nature of said Loan Parties' business; or (iii) result in the incurrence of Debts (as defined below) beyond any of Loan Parties' ability to pay them when and as they mature and become due and payable. For the purposes of this paragraph, "Insolvent" means that the present fair salable value of assets is less than the amount that will be required to pay the probable liability on existing Debts as they become absolute and matured. For the purposes of this paragraph, "Debts" includes any legal liability for indebtedness, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent. Loan Parties each hereby acknowledge and warrant that they have derived or expects to derive a financial or other benefit or advantage from this Amendment.

XIII.   Payment of Expenses. In the event any action (whether or not in a court proceeding) shall be required to interpret, implement, modify, or enforce the terms and provisions of this Amendment and/or to declare rights under same, the prevailing party in such action shall recover from the losing party all of its reasonable fees and costs, including, but not limited to, the reasonable attorneys' fees and costs of Administrative Agent's outside counsel.

XIV.   Governing Law. This Amendment shall be construed and interpreted in accordance with and shall be governed by the laws of the State of California.

XV.   Successors, Assignment. This Amendment shall be binding on and inure to the benefit of all of the Parties, and upon the heirs, executors, administrators, legal representatives, successors and assigns of the Parties, and each of them. The terms and provisions of this Amendment are for the exclusive benefit of Loan Parties and Administrative Agent, and may not be transferred, assigned, pledged, set over or negotiated to any person or entity without the prior express written consent of Administrative Agent and in accordance with the Credit Agreement.

XVI.   Complete Agreement of Parties. This Amendment constitutes the entire agreement between Administrative Agent and Loan Parties arising out of, related to or connected with the subject matter of this Amendment. Any supplements, modifications, waivers or terminations of this Amendment shall not be binding unless executed in writing by the parties to be bound thereby. No waiver of any provision of this Amendment shall constitute a waiver of any other provision of this Amendment (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided.

XVII.   Authority. Loan Parties each represent and warrant that: (i) each has full authority to execute this Amendment; (ii) the execution, delivery and performance of this Amendment does not require the consent or approval of any person, entity, governmental body, trust, trustor or other authority; (iii) this Amendment is a valid, binding and legal obligation of all Loan Parties

9

EXHIBIT 3

enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity, and does not contravene or conflict with any other agreement, indenture or undertaking to which any Loan Party is a party, except the Credit Agreement, the Notes or any of the other Loan Documents; and (iv) Loan Parties are the sole and lawful owners of all right, title, and interest in and to every claim and other matter which Loan Parties purport to settle or compromise herein.

XVIII. Execution In Counterparts.   This Amendment may be executed in any number of counterparts each of which, when so executed and delivered, shall be deemed an original, and all of which together shall constitute but one and the same Agreement.

XIX.   Contradictory Terms/Severability.   In the event that any term or provision of this Amendment contradicts any term or provision of any other document, instrument or agreement between the Parties including, but not limited to, the Credit Agreement, the Notes or any of the other Loan Documents, the terms of this Amendment shall control.   If any provision of this Amendment shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Amendment, and the validity, legality and enforceability of the remaining provisions of this Amendment shall not be adversely affected or impaired, and shall thereby remain in full force and effect.

XX.   Headings.   All headings contained herein are for convenience purposes only, and shall not be considered when interpreting this Amendment.

XXI.   Continuing Cooperation.   The Parties shall cooperate with each other in carrying out the terms and intent of this Amendment, and shall execute such other documents, instruments and Agreements as are reasonably required to effectuate the terms and intent of this Amendment.

XXII. Consultation With Counsel.   Each party hereto acknowledges that it is freely and voluntarily entering into this Amendment.   Moreover, each party hereto also acknowledges that it has been represented by counsel of its own choice at each stage in the negotiation of this Amendment, or has knowingly and voluntarily elected not to be represented by counsel at each stage in the negotiation of this Amendment.   To the extent any party was represented by counsel, and without waiving the attorney-client and attorney work product privileges, said party acknowledges that: (i) it has relied on such counsel's advice throughout all of the negotiations which preceded the execution of this Amendment, and in connection with the preparation and execution of this Amendment; (ii) such counsel has read and approved this Amendment; and (iii) such counsel has advised such party concerning the validity and effectiveness of this Amendment, and the transactions to be consummated in accordance therewith.

EXHIBIT 3

XXIII.   Notices.  All notices, payments, requests, information and demands which any party hereto may desire, or may be required to give or make to the other party shall be given or made to such party in accordance with the existing provisions of the Notes and the other Loan Documents.

AGREED AND ACCEPTED:

ADMINISTRATIVE AGENT:           CITY NATIONAL BANK

By: _____
Name: _____
Its: _____

LENDER:                         CITY NATIONAL BANK

By: _____
Name: _____
Its: _____

LENDER:                         BRIDGE FUNDING GROUP, INC.

By: _____
Name: _____
Title: _____

BORROWER:                       NKS RESTAURANTS, L.C.

By: _____
Name: GARRETT CAZIER
Title: CFO

BORROWER:                       HR RESTAURANTS, L.C.

By: _____
Name: GARRETT CAZIER
Title: CFO

*[signatures continued on next page]*

11

EXHIBIT 3

BORROWER:                    MR RESTAURANTS, L.C.

By:
Name:
Title: CFo


BORROWER:                    C UTAH, L.C.

By:
Name: GARRETT CAZIER
Title: CFo


BORROWER:                    AZM RESTAURANTS UNLIMITED, L.C.

By:
Name: GARRETT CAZIER
Title: CFo


BORROWER:                    NDM RESTAURANTS, L.C.

By:
Name: GARRETT CAZIER
Title: CFo


12

EXHIBIT 3

## CONSENT AND REAFFIRMATION OF GUARANTORS

This Consent And Reaffirmation of Guarantors (this "Consent") is made with reference to that certain "Amendment To Forbearance Agreement" dated as of August 17, 2020, by and between (i) CITY NATIONAL BANK, a national banking association, as Administrative Agent for the Lenders ("Administrative Agent"); (ii) NKS RESTAURANTS, L.C., a Utah limited liability company; HR RESTAURANTS, L.C., a Utah limited liability company; MR RESTAURANTS, L.C., a Utah limited liability company; C UTAH, L.C., a Utah limited liability company; AZM RESTAURANTS, L.C., a Utah limited liability company; and NDM RESTAURANTS, L.C., a Utah limited liability company (individually, a "Borrowers" and collectively, "Borrowers"); (iii) MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"); and (iv) the Lenders signatory thereto (the "Amendment"). All capitalized terms not otherwise defined herein have the meanings given for said terms in the Amendment.

In order to guaranty Borrowers' indebtedness and obligations under the Credit Agreement and the Notes, MERIDIAN RESTAURANTS UNLIMITED, LC, a Utah limited liability company; and LOVELOUD RESTAURANTS, L.C., a Utah limited liability company (collectively, "Guarantors"), executed and delivered to Administrative Agent that certain "Continuing Guaranty" set forth in Article X of the Credit Agreement (as amended and modified from time to time, the "Guaranty"). Pursuant to the Guaranty, Guarantors jointly, severally and unconditionally guaranteed and promised to pay Administrative Agent, on demand, all Obligations and indebtedness owed by Borrowers to Administrative Agent under the Credit Agreement, the Notes and the other Loan Documents.

13

EXHIBIT 3

By executing below, Guarantors each hereby: (i) acknowledges and consents to Borrowers' execution of the Amendment; (ii) consents to all terms and conditions of the transactions contemplated in the Amendment; (iii) ratifies and affirms all of the terms, covenants, conditions and obligations contained in the Guaranty; (iv) reaffirms the continuing validity and enforceability of the Guaranty; (v) confirms that the Guaranty continues in full force and effect notwithstanding the execution of the Amendment; and (vi) knowingly and voluntarily agrees to join in and be bound to the terms of the Release of Claims contained in Section XI of the Amendment.

AGREED AND ACCEPTED AS OF THIS 17TH DAY OF AUGUST, 2020

GUARANTOR:

MERIDIAN RESTAURANTS UNLIMITED, LC

By: _____
Name: _GARRETT CAZIER_
Title: _CFO_

GUARANTOR:

LOVELOUD RESTAURANTS, L.C.

By: _____
Name: _GARRETT CAZIER_
Title: _CFO_

14

EXHIBIT 3